UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH FERRIGNO, Derivatively on Behalf of GAS NATURAL INC., | ) ) ) | Case No. 1:13-cv-2822 |
| | ) | Judge: |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR |
| | ) | VIOLATION OF THE SECURITIES |
| RICHARD M. OSBORNE, GREGORY J. | ) | EXCHANGE ACT OF 1934, |
| OSBORNE, THOMAS J. SMITH, W.E. | ) | BREACH OF FIDUCIARY DUTY, |
| ARGO, MICHAEL T. VICTOR, WADE F. | ) | WASTE OF CORPORATE ASSETS, |
| BROOKSBY, JOHN R. MALE, RICHARD | ) | AND UNJUST ENRICHMENT |
| K. GREAVES, GLENN D. HEMMINGER, | ) | |
| KEVIN J. DEGENSTEIN, NICHOLAS U. | ) | |
| FEDELI, JAMES R. SMAIL, STEVEN A. | ) | |
| CALABRESE, IAN ABRAMS, MARK D. | ) | |
| GROSSI, and JAMES E. SPRAGUE, | ) | |
| | ) | |
| Defendants, | ) ) | |
| | ) | |
| - and – | ) ) | |
| | ) | |
| GAS NATURAL INC., a Ohio corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | DEMAND FOR JURY TRIAL |

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant Gas Natural Inc. ("Gas Natural" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Gas Natural's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      This action arises out of Gas Natural's deceptive business practices and woefully inadequate Company-wide internal controls failures which have caused or allowed various individuals within the Company to engage in numerous illegal activities.  Plaintiff seeks to remedy breaches of fiduciary duties and prevent the officers and directors from continuing their wrongdoing.

3.      Gas Natural is a natural gas company, which primarily operates local distribution companies in seven states.  The Company's natural gas revenues are generated through state regulated tariffs.  All of the states served by Gas Natural limit the Company's rate of return based on purchasing, operating, and maintenance costs in order to ensure that customers are charged a "fair, just, and reasonable" price.  Thus, the Company is required to limit its rate of return by its "rate base," which generally includes its original purchasing cost, cost of inventory, and allowance for working capital, less accumulated depreciation of installed used and useful gas pipeline and other gas distribution or transmission facilities.

4.      Despite the above, for years the Company has systematically exploited and overcharged its customers through dubious deals with certain related parties and affiliates that are owned and controlled by Gas Natural's Chairman of the Board of Directors (the "Board") and

Chief Executive Officer ("CEO"), defendant Richard M. Osborne ("R. Osborne").  In particular, while the price of natural gas faced a steady decline, the Company drastically inflated its consumer pricing and funneled money to affiliated companies through a scheme of systematically overpaying its affiliates for gas purchases, and by paying its affiliates unearned fees for imaginary services that were never actually performed.

5.      In 2010, the Public Utilities Commission of Ohio ("PUCO") audited the Company to determine whether Gas Natural and its subsidiaries' purchasing and pricing policies complied with various Ohio public utilities regulations (the "2010 Audit").  They did not.  The 2010 Audit raised numerous issues concerning Gas Natural's gas purchases and dealings with related and affiliated companies, including with respect to potential unfair pricing, improper enforcement of contract terms, and excessive and improper payments to its affiliate, John D. Oil and Gas Marketing Company, LLC ("JDOG").  At that time, the Richard M. Osborne Trust (the "Osborne Trust") was an 86% owner of JDOG.  Defendant R. Osborne is the sole beneficiary of the Osborne Trust.

6.      As part of the 2010 Audit, Gas Natural and PUCO reached a stipulation that purported to resolve all of the outstanding issues, including concerns over related-party transactions (the "2011 Stipulation").  The 2011 Stipulation, in relevant part, provided that Gas Natural would: (i) terminate its effective contracts for purchases of local production and the arrangement of natural gas purchases; (ii) terminate its contracts with JDOG; (iii) coordinate with PUCO and the Ohio Consumers' Counsel (the "OCC") in designing and implementing a request for proposal ("RFP") to solicit legitimate competitive bids to supply all or part of the Company's natural gas requirements at reasonable market prices; and (iv) initiate the first competitive bidding process by November 1, 2011.

7.      In blatant disregard for the 2011 Stipulation, the Individual Defendants (as defined herein) made no effort to reform the Company's underhanded practices.   In fact, following a renewed audit by PUCO in 2012 (the "2012 Audit"), on November 13, 2013, PUCO issued an Opinion and Order (the "2013 Order") concluding that the Company: (i) failed to timely initiate the RFP bidding process; (ii) rigged the purportedly competitive RFP bidding process to ensure JDOG would win the contract; (iii) continued to systematically overpay JDOG for natural gas purchases resulting in premium payments due to the Company's customers in the years following the 2011 Stipulation; and (iv) improperly charged its customers a processing fee for gas that was never actually processed, paid to Cobra Pipeline Co., Ltd. ("Cobra"), another affiliated company controlled by defendant R. Osborne.   Thus, the 2013 Order directed the Company to void all contracts with JDOG, immediately commence a new RFP process, and refund customers for the artificially high gas prices, premiums, and fees they paid to the Company as a result of the Individual Defendants' improprieties.

8.      The 2012 Audit also found a "remarkable lack of control" within the Company. As a result, PUCO staff ("Staff") made an "unprecedented recommendation" that PUCO order a full blown investigation into Gas Natural's management practices, including, with respect to, the Company's related and affiliated regulated companies.  As stated in the 2013 Order:

> ***The evidence shows that there is a severe organizational dysfunction within the Companies and between the regulated companies and their non-regulated affiliates***…
>
> Staff recommended that the Commission order an investigation into the management practices of the Companies. Staff urged the Commission to not only inquire into the Companies, but to include their related and affiliated regulated companies, as well. Staff emphasized that this is, in fact, an unprecedented recommendation; however, it comes following a series of extremely frustrating audits of the Companies, ***rife with self-dealing that demonstrates a remarkable lack of control***.

9.     In fact, Gas Natural's corporate structure is so dysfunctional that the Company's Vice President and Chief Financial Officer ("CFO"), defendant Thomas J. Smith ("Smith"), testified to PUCO that he thought he was President of Gas Natural, "but I can't be certain." Defendant Smith's uncertainty as to his role at the Company is understandable given the numerous other roles he purportedly fills at Gas Natural's affiliates, including, among others, serving as President of Cobra and president of two "shell" companies that PUCO described as companies that are "designed to shield [defendant R.] Osborne from liability and for which no one reported."  Defendant Smith also admitted that he was unaware of whether he held corporate titles, including President, to various other related companies.

10.     Defendant Smith was not alone in his failure to understand his roles and responsibilities at Gas Natural.  As summed up by PUCO:

> The extent of the unawareness and negligence of the senior management of the Companies to their managerial and fiduciary duties and responsibilities, the failure to enforce internal controls, the lack of control over access to company records, the impropriety of the compensation system for employees of the Companies, and the functional absence of responsible persons serving in management positions, *all of these situational deficiencies appear to be the norm, rather than the exception*….

11.     In addition to the above, the 2012 Audit also revealed that several of the Company's proxy statements contained false or misleading statements.  Specifically, in 2012, the Company sought to acquire JDOG from the Osborne Trust and issued multiple proxies asking for shareholder approval of the acquisition, as well as approval to list additional shares to be issued as considered for the acquisition.  The proxies, however failed to disclose the JDOG price rigging scheme and the Company's lack of adequate internal controls.  Thus, the Company's misinformed shareholders ultimately voted to approve the acquisition in March 2013 on the basis of the inaccurate statements contained in these proxies.  As a result of the transaction, defendant R. Osborne acquired 256,926 shares of Gas Natural common stock with a fair value price of over

$2.87 million.  If the Board had accurately described Gas Natural's inadequate internal controls and JDOG and the Company's price rigging scheme, the Company's shareholders would not have approved the acquisition.

12.     The Individual Defendants' blatant disregard for their corporate responsibilities and refusal to implement adequate internal controls allowed defendant R. Osborne to dominate and control the Company for personal and familial gain.  The Company's Board readily allowed defendant R. Osborne to staff executive positions at the Company and its affiliates with subservient personnel that were willing to repeatedly acquiesce to his demands, including his son, defendant Gregory J. Osborne ("G. Osborne") who is the Company's current Chief Operating Officer ("COO"), a member of the Board, and the longtime President and COO of JDOG.

13.     The initial release of the 2013 Order received no media attention and had a minimal initial effect on the market.  Over the next week, however, as analysts and more savvy investors began to discover and digest the dense report, the Company's share price experienced a steady decline.  From November 13, 2013, the day the report was published, to November 22, 2013, Gas Natural's stock fell more than 6.6%, or $0.66 per share, to close at $9.23 compared to the November 13 closing of $9.89, erasing almost $7 million in market capitalization.  On Friday, November 22, 2013, *Seeking Alpha* broke the news to the market in a story titled "Gas Natural: Investigation And Insider-Selling Suggests Trouble Ahead."  The article disclosed the PUCO findings and included a link to the 2013 Order.  The following trading day, Gas Natural's stock plummeted another 9.6%, or $0.89 per share, to close at $8.34 compared to the previous trading day's closing of $9.23, erasing another $9.3 million in market capitalization.  From the

date the 2013 Order was published to the day after the *Seeking Alpha* article broke the news, the Company's market capitalization was devastated by a $16.2 million, or over 15.6% drop.

14.     Certain Individual Defendants, however, fared much better than the Company by collectively selling over $10.87 million worth of their personally held shares at artificially inflated prices.  Between May 5, 2013 and November 5, 2013, defendants R. Osborne and Smith collectively dumped more than 1.06 million of their personally held shares of artificially inflated Gas Natural stock for proceeds of over $10.68 million.  The vast majority of those shares were sold less than two weeks before the 2013 Order was released to the public.  Another defendant, the Company's former President and COO, sold 20,000 of his personally held shares in January 2013 for proceeds of approximately $194,755.

15.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company with their faithless actions.  Despite clear requirements set forth by PUCO following the 2010 Audit, the Individual Defendants caused or allowed Gas Natural to ignore virtually every stipulation the Company agreed to follow.  The Individual Defendants knowingly or recklessly failed to conduct a competitive RFP at arm's length, failed to terminate the effective contracts for gas purchases from affiliated companies, and failed to implement measures to ensure that Gas Natural and its customers paid fair prices for natural gas purchases. The Company's continued relationship with the defendant R. Osborne controlled companies threaten its very existence.

### JURISDICTION AND VENUE

16.     This Court has jurisdiction over all claims asserted herein pursuant to section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") for violations of sections 14(a) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9

promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     Venue is proper in this District because plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Gas Natural is incorporated in Ohio and is headquartered in this District.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## THE PARTIES

**Plaintiff**

18.     Plaintiff Joseph Ferrigno was a shareholder of Gas Natural at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Gas Natural shareholder.

**Nominal Defendant**

19.     Nominal defendant Gas Natural is an Ohio corporation with principal executive offices located at 1 First Avenue South, Great Falls, Montana.  Gas Natural, formerly Energy West, Incorporated ("Energy West"), is a natural gas company primarily operating local distribution companies that serve approximately 73,000 customers in Ohio, Maine, Montana, Wyoming, North Carolina, Pennsylvania, and Kentucky.  The Company has natural gas utility subsidiaries including, among others, Brainard Gas Corp ("Brainard"), Northeast Ohio Natural Gas Corporation ("Northeast"), and Orwell Natural Gas Company ("Orwell").  Approximately

87% of the Company's revenues in 2012 were derived from its natural gas utility operations. Gas Natural's operations also include production and marketing of natural gas, gas pipeline transmission, gathering, and propane operations. On August 15, 2012, Gas Natural entered into an asset purchase agreement with defendant R. Osborne and JDOG, a publicly traded company which was primarily owned by defendant R. Osborne and which filed for Chapter 11 bankruptcy in January 2012, to purchase JDOG for $2.9 million. On June 3, 2013, Gas Natural completed its acquisition of JDOG.

**Defendants**

20.     Defendant R. Osborne is Gas Natural's CEO and has been since November 2007, Chairman of the Board and has been since 2005, and a director and has been since 2003. Defendant R. Osborne controls approximately 405,777, or 3.9%, of the Company's shares, either personally or through various entities that he owns and manages. Defendant R. Osborne is also Chairman of Northeast and Orwell and Chairman of the Board, CEO, and a director of JDOG and has been since September 1998. On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant R. Osborne was also a director of Energy West. Defendant R. Osborne is the father of defendant G. Osborne. Defendant R. Osborne knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls. Moreover, defendant R. Osborne acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG. While in

possession of material, non-public information concerning Gas Natural's true business health, defendant R. Osborne sold 1,006,911 shares of his stock for $10,069,110 in proceeds.  Gas Natural paid defendant R. Osborne the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|------|--------|------------------------|-------|
| 2012 | $250,000 | $53,008 | $303,008 |
| 2011 | $250,000 | $44,508 | $294,508 |
| 2010 | $250,000 | $37,200 | $287,200 |
| 2009 | - | $24,000 | $24,000 |
| 2008 | - | $24,000 | $24,000 |

21.     Defendant G. Osborne is Gas Natural's President and COO and has been since November 2013 and a director and has been since September 2009.  Defendant G. Osborne is also President and COO of Energy West Resources, Inc., the Company's marketing and production subsidiary, and has been since February 2012.  Defendant G. Osborne was President, COO, and a director of JDOG from 2005 to January 2012 and an Executive Vice President of Orwell from 2001 to 2003.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant G. Osborne was also a director of Energy West.  Defendant G. Osborne is the son of defendant R. Osborne.  Defendant G. Osborne knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant G. Osborne acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant G. Osborne the following compensation as a director:

- 9 -

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $24,000 | $24,000 |
| 2009 | $8,000 | $8,000 |

22.     Defendant Smith is Gas Natural's Vice President and CFO and has been since November 2007 and a director and has been since December 2003.  Defendant Smith was also Gas Natural's Interim President from August 2007 to November 2007.  Defendant Smith is President of Northeast and has been since 2003; President of Orwell and has been since 2002; a director of JDOG and has been since 1998; and was President and COO of JDOG from 1998 to 2003.   On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Smith was also a director of Energy West.  Defendant Smith will retire as Gas Natural's Vice President and CFO on May 1, 2014, and plans to remain a director of the Company.  Defendant Smith knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Smith acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  While in possession of material, non-public information concerning Gas Natural's true business health, defendant Smith sold 57,244 shares of his stock for $576,488.21 in proceeds.  Gas Natural paid defendant Smith the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2012 | $198,263 | $48,900 | $46,856 | $66,808 | $360,827 |
| 2011 | $192,300 | $56,700 | $50,220 | $69,903 | $369,123 |
| 2010 | $185,064 | $40,000 | $48,705 | $66,854 | $340,623 |

23.     Defendant W.E. Argo ("Argo") is Gas Natural's Vice Chairman of the Board and has been since January 2013 and a director and has been since 2002.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Argo was also a director of Energy West.  Defendant Argo knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Argo acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Argo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $24,000 | $24,000 |
| 2009 | $24,000 | $24,000 |
| 2008 | $24,000 | $24,000 |

24.     Defendant Michael T. Victor ("Victor") is a Gas Natural director and has been since December 2008.  Defendant Victor is also a member of Gas Natural's Audit Committee and has been since at least September 2009.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Victor was also a director of Energy West. Defendant Victor knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly

overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Victor acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Victor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $24,000 | $24,000 |
| 2009 | $24,000 | $24,000 |

25.    Defendant Wade F. Brooksby ("Brooksby") is a Gas Natural director and has been since August 2010.  Defendant Brooksby was also Gas Natural's CFO from 2004 to November 2007.  Defendant Brooksby is Chairman of Gas Natural's Audit Committee and has been since August 2010.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Brooksby was also a director of Energy West.  Defendant Brooksby knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Brooksby acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Brooksby the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $10,000 | $10,000 |

26.     Defendant John R. Male ("Male") is a Gas Natural director and has been since September 2010.  Defendant Male is also a member of Gas Natural's Audit Committee and has been since at least April 2012.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Male was also a director of Energy West.  Defendant Male knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Male acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Male the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $8,000 | $8,000 |

27.     Defendant Richard K. Greaves ("Greaves") is a Gas Natural director and has been since July 2013.  Defendant Greaves knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Greaves acted with at least negligence in approving Gas Natural's proxy statements

tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.

28.    Defendant Glenn D. Hemminger ("Hemminger") was Gas Natural's Director of Finance from 2008 to May 2011 and Treasurer from September 2010 to May 2011.  Defendant Hemminger knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Hemminger acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Hemminger the following compensation as an executive:

| Year | Salary | Bonus | All Other Compensation | Total |
|------|--------|-------|------------------------|-------|
| 2010 | $112,554 | $60,000 | $7,830 | $180,384 |

29.    Defendant Kevin J. Degenstein ("Degenstein") was Gas Natural's President and COO from June 2008 to November 2013.  Defendant Degenstein knowingly, recklessly, or with gross negligence caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Degenstein acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  While in possession of material, non-public information concerning Gas Natural's true business health, defendant

Degenstein sold 20,000 shares of his stock for $194,755.70 in proceeds.  Gas Natural paid defendant Degenstein the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2012 | $207,950 | $51,225 | - | $15,135 | $274,310 |
| 2011 | $201,450 | $59,400 | - | $14,935 | $275,785 |
| 2010 | $194,550 | $57,330 | $14,100 | $15,978 | $281,958 |
| 2009 | $186,550 | $57,330 | $22,800 | $9,306 | $275,986 |
| 2008 | $170,771 | $25,000 | - | $7,775 | $203,546 |

30.     Defendant Nicholas U. Fedeli ("Fedeli") was a Gas Natural director from August 2010 to June 2013.  Defendant Fedeli was also a member of Gas Natural's Audit Committee from August 2010 to at least May 2011.  On information and belief, including based on certain Montana Consumer Counsel Comments published on July 12, 2012, in connection with Energy West's application to restructure, defendant Fedeli was also a director of Energy West. Defendant Fedeli knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Fedeli acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Fedeli the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|-------------|-------------------|-------|
| 2012 | $38,500 | $38,500 |
| 2011 | $30,000 | $30,000 |
| 2010 | $8,000 | $8,000 |

31.     Defendant James R. Smail ("Smail") was a Gas Natural director from 2007 to July 2010.  Defendant Smail was also a director of JDOG from December 2006 to August 2009. Defendant Smail was Chairman of Gas Natural's Audit Committee from April 2010 to at least July 2010 and a member of that committee from at least October 2007 to July 2010.  Defendant

Smail knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Smail acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Smail the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2010 | $14,000 | $14,000 |
| 2009 | $24,000 | $24,000 |
| 2008 | $24,000 | $24,000 |

32.    Defendant Steven A. Calabrese ("Calabrese") was a Gas Natural director from 2006 to September 2009.  Defendant Calabrese was also a director of JDOG from September 1998 to August 2009.  Defendant Calabrese knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls. Moreover, defendant Calabrese acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Calabrese the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2009 | $18,000 | $18,000 |
| 2008 | $24,000 | $24,000 |

33.    Defendant Ian Abrams ("Abrams") was a Gas Natural director from February 2008 to at least June 2010.  Defendant Abrams knowingly or recklessly caused or allowed Gas

Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls. Moreover, defendant Abrams acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Abrams the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | - | $24,000 | $24,000 |
| 2008 | $14,000 | $10,000 | $24,000 |

34.  Defendant Mark D. Grossi ("Grossi") was a Gas Natural director from 2005 to August 2009.  Defendant Grossi was also a director of JDOG from September 1998 to August 2009.  Defendant Grossi was a member of Gas Natural's Audit Committee from at least October 2007 to August 2009.  Defendant Grossi knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Grossi acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Grossi the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|---|---|---|
| 2009 | $16,000 | $16,000 |
| 2008 | $24,000 | $24,000 |

35.  Defendant James E. Sprague ("Sprague") was a Gas Natural director from 2006 to March 2010.  Defendant Sprague was also Chairman of Gas Natural's Audit Committee from at

least October 2007 to March 2010.  Effective May 1, 2014, defendant Sprague will become Gas Natural's Vice President and CFO.  Defendant Sprague knowingly or recklessly caused or allowed Gas Natural to: (i) repeatedly overcharge for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) rig the RFP to ensure its affiliates would win the contracts; and (iii) operate in an environment utterly devoid of adequate internal controls.  Moreover, defendant Sprague acted with at least negligence in approving Gas Natural's proxy statements tainted by false and misleading statements regarding the Company's proposed acquisition of JDOG.  Gas Natural paid defendant Sprague the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Total |
|-------------|-------------------|-------|
| 2010 | $6,000 | $6,000 |
| 2009 | $24,000 | $24,000 |
| 2008 | $24,000 | $24,000 |

36.     The defendants identified in ¶¶20-22, 28-29 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20-27, 30-34 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶24-26, 30-31, 34-35 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶20, 22, 29 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶20-35 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

37.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Gas Natural and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Gas Natural in a fair, just, honest, and equitable manner.  The Individual

Defendants were and are required to act in furtherance of the best interests of Gas Natural and not in furtherance of their personal interest or benefit.

38. To discharge their duties, the officers and directors of Gas Natural were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Gas Natural were required to, among other things:

(a) properly and accurately police related-party transactions from going forward on terms unfavorable to the Company and its shareholders;

(b) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(c) ensure that the Company complied with its legal obligations and requirements, including complying with regulatory requirements, complying with the stipulations it agreed to in connection with the 2010 Audit, and disseminating truthful and accurate statements to the investing public;

(d) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e) remain informed as to how Gas Natural conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(f)     refrain from acting upon material, inside corporate information to benefit themselves;

(g)     ensure that there were sufficient checks, balances, and controls in Gas Natural's accounting, finance, and operational functions, and related functions, to prevent internal control problems; and

(h)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

39.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Gas Natural, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

40.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in a multi-year scheme to artificially inflate its natural gas prices, funnel money into affiliated companies, and ignore various stipulations associated with the 2010 Audit.  These improper practices wasted the Company's assets and caused Gas Natural to incur substantial damage.

41.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Gas Natural, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Gas Natural has expended, and will

continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

42.     In addition to these duties, under its Charter in effect since at least July 2010, the Audit Committee Defendants, defendants Brooksby, Fedeli, Grossi, Male, Smail, Sprague, and Victor, owed specific duties to Gas Natural to assist the Board in overseeing "responsibility to the shareholders, potential shareholders, the investment community, regulators, vendors, customers and others."  In particular, the Audit Committee Defendants are required to oversee, among other things, the:

- integrity of the Company's financial statements;

- Company's compliance with ethics policies and codes of conduct;

- Company's compliance with legal and regulatory requirements; and

- adequacy of the Company's response to reports of material violations of securities laws or breaches of fiduciary duty made by outside corporate attorneys, employees or other parties.

**Additional Duties Under the Code of Business Conduct for Directors, Officers and Employees**

43.     The Company has also instituted a Code of Business Conduct for Directors, Officers, and Employees (the "Code").  The Code specifies the duties for the Company's fiduciaries, most notably "[s]afeguarding [c]ompany [a]ssets."  In particular, the Code states:

### SECTION XIII

### SAFEGUARDING COMPANY ASSETS

The Company is strictly accountable for any funds and property entrusted to its care. You are not to use (without prior approval by a Company Officer), spend or dispose of Company funds, or property for personal use or benefit, or in a manner or for a cause that is unethical or illegal.

You are responsible for maintaining written records and expense reports in sufficient detail to completely, accurately and fairly reflect all transactions and expenditures made on behalf of the Company. These documents must be prepared

on a timely basis. The falsification of any such documents with inaccurate or misleading data is prohibited.  Furthermore, you must accurately track and segregate any personal expenses that may be co-mingled with business expenses. This includes segregating personal phone charges incurred via office or cellular telephones, or Company sponsored credit cards.

\* \* \*

**Financial Records and Periodic Reports**

The Financial Personnel will establish and manage the Company's financial accounting and reporting systems and procedures to ensure that:

- Business transactions are properly authorized and completely and accurately recorded on the Company's books and records in accordance with Generally Accepted Accounting Principles ("GAAP") and established Company financial policies.

- The retention or proper disposal of Company records shall be in accordance with established enterprise financial policies and applicable legal and regulator requirements.

- The Company's financial disclosures and periodic reports are full, fair, accurate, timely and understandable and comply with all applicable laws. Accordingly, the Financial Personnel shall ensure that any material information of which he or she may become aware that affects the disclosures made by the Company in its public **filings** is properly taken into account in connection with the preparation and approval of such public filings.

**Compliance with Laws, Rules and Regulations**

The Company is committed to conducting our business in accordance with all applicable laws, rules and regulations and in accordance with the highest standards of business ethics. The Financial Personnel must comply with applicable laws and create a culture of high ethical standards and commitment to compliance; maintaining a work environment that encourages employees to raise concerns; and promptly addressing employee compliance concerns. Financial Personnel will establish and maintain mechanisms to:

- Educate members of the finance organization about federal, state and local statutes and regulations that affect the operation of the finance organization and the enterprise generally.

- Monitor the compliance of the finance organization with such statutes and regulations.

- Identify, report, and correct in a swift and complete manner, any failures to comply with such statutes and regulations.

**Reporting Responsibilities**

- The Financial Personnel shall promptly report to the Audit Committee any information he or she may have concerning (i) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

- The Financial Personnel shall promptly report to the Audit Committee any information he or she may have concerning any violation of the Code of Business Conduct or the Financial Code of Ethics, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

- The Financial Personnel shall promptly report to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any Company employee or agent, or of violation of the Code of Business Conduct or of the Financial Code of Ethics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Gas Natural, regarding the Individual Defendants' management of Gas Natural's operations and scheme to overcharge the Company's customers for natural gas;

(ii) funnel improper fees and premiums to entities controlled by defendant R. Osborne; (iii) facilitate defendants R. Osborne, Smith, and Degenstein's illicit sale of over $10.84 million of their personally held shares while in possession of material, non-public information; and (iv) enhance the Individual Defendants' executive and directorial positions at Gas Natural and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

46.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

47.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

48.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

**Overview of Gas Natural**

50.     Gas Natural is the parent company of multiple subsidiaries including: Energy West, Gas Natural Resources, LLC ("GNR"), Gas Natural Service Company, LLC ("GNSC"), Brainard, Great Plains Natural Gas Company ("Great Plains"), Independence Oil, LLC, Lightning Pipeline Company, Inc. ("Lightning"), and Public Gas Company, Inc. ("PGC"). Brainard is a natural gas utility company with operations in Ohio.  Energy West is the parent company of multiple entities that are natural gas utility companies with regulated operations in Maine, Montana, North Carolina, and Wyoming, as well as non-regulated operations in Maine, Montana, and Wyoming.  GNR is a natural gas marketing company that markets gas in Ohio. GNSC manages gas procurement, transportation, and storage for Brainard and subsidiaries of Lightning and Great Plains.  Great Plains is the parent company of Northeast, which is a regulated natural gas distribution company with operations in Ohio.  Lightning is the parent company of Orwell, a regulated natural gas distribution company with operations in Ohio.

51.     Defendant R. Osborne is the sole beneficiary of the Osborne Trust.  The Osborne Trust is the majority shareholder for numerous companies affiliated with Gas Natural, including: Cobra, JDOG, Great Plains, Orwell-Trumbull Pipeline Co., LLC.  The Osborne Trust was also a longtime majority shareholder of JDOG, holding an 86% stake in the company.  On August 15, 2012, Gas Natural entered into a purchase agreement with JDOG and defendant R. Osborne to acquire JDOG.  The acquisition was completed on June 1, 2013.  As of November 5, 2013, defendant R. Osborne owned or controlled 3.9% of the Company's shares, with 185,000 shares

owned personally, and 220,777 shares owned by JDOG, of which defendant R. Osborne is the managing member.

**Overview of Gas Natural's Ohio Operations**

52.     The 2010 Audit, 2011 Stipulation, 2012 Audit, and the 2013 Order all relate to the regulation of Northeast and Orwell.  Northeast and Orwell are local distribution companies serving portions of Ohio.  In 2002, Orwell's stock was transferred to Lightning, and primarily held by the Osborne Trust.  In June 2003, Northeast was purchased by Great Plains which was owned at the time by defendant R. Osborne.

53.     In 2007, defendant R. Osborne was brought in to turn around Energy West. Defendant R. Osborne began implementing a roll-up business plan by purchasing various individual businesses to consolidate them in attempt to gain economies of scale through growth. In 2008, Energy West purchased all of the stock of Lightning, Orwell, Northeast, as well as Brainard.  Each of these entities was primarily owned by the Osborne Trust. In addition, defendant Smith was a shareholder and officer of the acquired companies.

54.     In 2009, Energy, Inc. reorganized into a holding company as the successor to Energy West, now a direct wholly-owned subsidiary of Gas Natural.

**SUBSTANTIVE ALLEGATIONS**

**Gas Natural's History of Excessive Payments to JDOG**

55.     Gas Natural is the gas procurement and asset manager of Northeast and Orwell. From 2000 through 2007, Northeast and Orwell used in-house employees to purchase gas directly from local producers.   During that time, Northeast and Orwell purchased local production gas at an average rate that was $1.03 per Mcf (thousand cubic feet) *less* than the average cost of interstate gas supplies.

56.     Beginning in 2008, the Gas Natural's affiliate, JDOG, took over the gas purchasing function and became the sole entity responsible for gas purchases.  Immediately, Northeast and Orwell began paying more for local production, with rates skyrocketing to $0.85 per Mcf *more* than the average cost of interstate gas.

57.     Gas Natural never questioned JDOG's exorbitant rates.  Instead, the Company merely verified the rates and quantities billed by JDOG and passed those bills along to Northeast and Orwell, and the excessive costs were passed on to consumers.

**The 2010 Audit and 2011 Stipulation**

58.     PUCO audited Gas Natural in 2010.  The 2010 Audit determined that Gas Natural and its subsidiaries' purchasing and pricing policies did not comply with various Ohio public utilities regulations.  The 2010 Audit raised numerous issues concerning Gas Natural's gas purchases and dealings with related and affiliated companies, including with respect to potential unfair pricing, improper enforcement of contract terms, and excessive and improper payments to JDOG.

59.     As part of the 2010 Audit, Gas Natural and PUCO reached the 2011 Stipulation wherein the Company purportedly resolved all of the outstanding issues, including concerns over related-party transactions.  One of the principal agreements contained in the 2011 Stipulation was that Gas Natural and its subsidiaries would develop and implement an RFP which would lead to a competitive bidding process to procure the natural gas commodity requirements for its customers.

60.     The parties agreed that Gas Natural would coordinate with Staff and OCC in designing and implementing the RFP and the selection criteria to manage the interstate transportation and storage capacity assets of Northeast and Orwell (sometimes referred to herein

as the "Companies") and procure the gas requirements of Northeast's and Orwell's customers in the local and interstate markets.  The parties also agreed that bids received from competitive gas marketers would be provided to Gas Natural, the Companies, Staff, and OCC, contemporaneously, and that Gas Natural would select the successful bidder in consultation with Northeast and Orwell. The parties further agreed that marketers who were affiliated with or related to the Companies, such as JDOG, would have the opportunity to participate in the competitive bidding process on the identical terms and access to information as non-affiliated marketers.  In addition, the stipulating parties agreed that the RFP process would be completed by November 1, 2011.

**JDOG and Two Other Companies Run by Defendant R. Osborne File for Chapter 11 Bankruptcy**

61.     Despite the Individual Defendants' scheme to funnel money to JDOG, JDOG was burdened with $11 million in debt and only $8.2 million in assets.  In January 2012, JDOG filed for Chapter 11 bankruptcy.  As the business was going sour, Gas Natural continued to pay JDOG's excessive premiums for natural gas.

62.     Two of defendant R. Osborne's other companies also filed for Chapter 11 bankruptcy at the same time, including Oz Group and GreatLakes Exploration.  The three bankruptcies, which borrowers asked the court to administer jointly, are related to two loans totaling $30 million from a local bank.

**Gas Natural Rigs the RFP to Ensure JDOG Wins the Bid and Continues Charging Excessive Fees**

63.     Although the Company agreed to complete the RFP process by November 1, 2011, the RFP was not completed until December 2012, over thirteen months after the agreed upon completion date.  The RFP appears to have been delayed in order to allow JDOG time to complete its bankruptcy proceedings.

64.     While JDOG dealt with its bankruptcy, Gas Natural was busy crafting a RFP that would ensure JDOG would again win the contracts.  As noted by PUCO in the 2013 Order, the RFP was poorly drafted and lacked sufficient information to allow potential bidders, other than the Company's affiliates, to make an informed bid.  The RFP also included a requirement that limited the procurement strategies to include local production contracts by JDOG, which created an RFP that favored the affiliates.

65.     After PUCO reviewed the draft RFP, Staff made suggestions, raised various concerns, and specifically requested the deletion of ambiguous language.  In blatant disregard, Gas Natural ignored all of PUCO's suggestions and left the inadequate RFP as is.  As concluded by PUCO in the 2013 Order, "it is clear that [Gas Natural, Northeast, and Orwell] … failed to undertake a reasonable RFP process and acted imprudently in designing and implementing a reasonable RFP."   Unsurprisingly, the RFP resulted in a single bidder for the contract; JDOG.

66.     Throughout the RFP process, Gas Natural continued funneling money to JDOG through excessive premiums and unearned fees.  According to OCC, Gas Natural, Northeast, and Orwell "*failed to provide evidence or even a reasonable explanation as to the value, if any, the Companies received in exchange for JDOG's fees*."  OCC questioned why any fees were paid to JDOG when there was evidence that employees of the Companies performed the same duties JDOG was paid to perform.  Staff similarly found that "the premium payments to JDOG were unjustified because there was no evidence that JDOG provided any service justifying the premiums charged and this ultimately distorted the cost of local production."

67.     Improper premiums paid during the 2012 Audit period alone included approximately $1.2 million in premiums to purchase local production, including $640,000 paid for "purchasing decisions [that] were questionable" and gas that was not needed.  In addition,

there were occasions when unneeded gas was purchased and put into storage, which would create large imbalances.  Despite the imbalance, purchases were inexplicably increased.

**PUCO Discovers that Gas Natural Was Also Paying Cobra Unearned Fees for Services that Were Never Performed**

68.     In its review of supply sources, Staff noted that Northeast's gas supplies are delivered through a combination of interstate and intrastate pipelines, including through a pipeline operated by Cobra, another Gas Natural affiliated company.  Cobra's pipeline system connects portions of the Companies' system to Columbia Gas Transmission Corporation. Cobra initiated service to the Gas Natural subsidiaries in February 2008 and serves Northeast off its Churchtown, Holmesville, and North Trumbull systems.

69.     The 2012 Audit found that during the Audit period, Northeast paid an improper and unearned $0.25 per Dth (dekatherm) processing fee to Cobra on natural gas volumes. Northeast was unable to prove that the gas volumes were ever sent to the Cobra processing plant or actually processed.  When a former employee attempted to verify whether the volumes that were charged a fee by Cobra were actually processed, she was fired.

**Gas Natural Acquires JDOG**

70.     As the 2012 Audit was wrapping up, the viability of the Individual Defendants' continuing scheme to funnel money to JDOG was substantially threatened.   Further, with PUCO and OCC scrutinizing the excessive payments to JDOG, JDOG and its majority stakeholder, defendant R. Osborne, risked financial devastation pending PUCO's audit report.  In a last ditch effort to save his floundering business at the expense of Gas Natural shareholders, defendant R. Osborne sold JDOG to the Company.

71.     On August 15, 2012, with the approval of the Board, Gas Natural entered into a purchase agreement with JDOG and defendant R. Osborne to acquire JDOG.  Gas Natural's

shareholders initially rejected the proposed acquisition at the Company's annual shareholders meeting on December 13, 2012.  On March 1, 2013, however, the shareholders approved the acquisition.  Defendant R. Osborne profited handsomely as a result, acquiring approximately 256,926 Gas Natural shares in exchange for JDOG, with a fair value price of over $2.87 million.

**Gas Natural's Remarkable Lack of Internal Control**

72.    The wrongdoing detailed herein was largely facilitated by the Board's decision to implement a "remarkable lack of control."  Indeed, as discovered by PUCO, affiliates, such as JDOG and Cobra, were not properly separated from Gas Natural and were given unfettered and inappropriate access to the Company's books and records.  Further, Gas Natural and its affiliates were "indifferen[t] and unaware[] of positional titles held by management within the Companies and the accompanying fiduciary duties and responsibilities."  In fact, Gas Natural's corporate structure is so dysfunctional that the Company's CFO, defendant Smith, testified to PUCO that he thought he was President of Gas Natural, "but I can't be certain."  Defendant Smith is not the Company's President.

73.    Defendant Smith's uncertainty as to his role at the Company is understandable given the numerous other roles he purportedly fills at Gas Natural's affiliates, including, among others, serving as President of Cobra and President of two "shell" companies that PUCO described as companies that are "designed to shield [defendant R.] Osborne from liability and for which no one reported."  Defendant Smith also admitted that he was unaware of whether he held corporate titles, including President, to various other related companies.

74.    Defendant Smith was unfortunately not alone in his failure to understand his roles and responsibilities at Gas Natural.  Indeed, the Company's corporate controller, who is responsible for reviewing financial statements and presenting financial statements accurately,

admitted to PUCO that she had no idea who was responsible for the Sarbanes-Oxley Act of 2002 ("SOX") compliance at Northeast and Orwell.  The assistant controller was also unaware of who was responsible for compliance at Northeast, Orwell, or Gas Natural.  In fact, during the 2012 Audit, not one individual at Northeast and Orwell, nor the companies as a whole, were able to provide evidence supporting that ***anyone*** within those companies was responsible for SOX compliance.  The compensation system at Gas Natural and its subsidiaries further blurred management's fiduciary obligations.  During the 2012 Audit there was testimony from a number of senior management officers, including defendant Smith, acknowledging that they were not compensated by the companies they purportedly worked for, but by entities related to or affiliated with Gas Natural and its subsidiaries.

75.    In addition to the Company's haphazard and ineffective corporate structure, the 2013 Order revealed additional questions concerning improper and self-serving conduct at Gas Natural and its subsidiaries.  For example, PUCO disclosed that it uncovered evidence that: (i) Gas Natural or its subsidiaries purchased and were paying for a Cadillac Escalade for one of defendant R. Osborne's sons, who was not an employee; (ii) the accounting treatment for the Cadillac purchase was corrected by making that son an employee; (iii) preferential treatment was given to affiliates and related companies when invoices were paid, specifically Cobra; (iv) Gas Natural and its subsidiaries made personal loans to defendant R. Osborne, who ultimately determined which payable should be paid in any given week; (v) checks were cut and held because there were no funds available to pay them and receivables were given a similar treatment with invoices to related parties left unpaid for, at times, more than a year; and (vi) Gas Natural and its subsidiaries regularly "flushed accounts," inappropriately offsetting payables and receivables.  ***These allegations were not disputed by Gas Natural or its subsidiaries***.

76.     Finally, the 2012 Audit uncovered evidence of manipulation of gas cost record filings at Gas Natural and its subsidiaries.  Gas Natural's corporate controller testified that on at least one occasion she overheard that employees were directed to increase the Company's reported gas cost rates and reconcile the following month with an incorrect number.   The incident was reported to the president of Energy West, but there is no indication that any corrective action was taken.  Similarly, a staff accountant testified that defendant Smith asked her to modify the Company's reported gas cost rate to be higher than it should have been.

77.     The Company's "remarkable lack of control" was summed up by PUCO as follows:

> The extent of the unawareness and negligence of the senior management of the Companies to their managerial and fiduciary duties and responsibilities, the failure to enforce internal controls, the lack of control over access to company records, the impropriety of the compensation system for employees of the Companies, and the functional absence of responsible persons serving in management positions, ***all of these situational deficiencies appear to be the norm, rather than the exception***….

78.     As a result, Staff made an "unprecedented recommendation" that PUCO order a full blown investigation into Gas Natural's management practices, including with respect to the Company's related and affiliated regulated companies.  As stated in the 2013 Order:

> ***The evidence shows that there is a severe organizational dysfunction within the Companies and between the regulated companies and their non-regulated affiliates***.
>
> *   *   *
>
> Staff recommended that the Commission order an investigation into the management practices of the Companies. Staff urged the Commission to not only inquire into the Companies, but to include their related and affiliated regulated companies, as well. Staff emphasized that this is, in fact, an unprecedented recommendation; however, it comes following a series of extremely frustrating audits of the Companies, ***rife with self-dealing that demonstrates a remarkable lack of control***.

79.     Other state agencies have also found that defendant R. Osborne's companies are self-servingly structured to frustrate state regulations to the detriment of consumers.   In 2012, Gas Natural's predecessor, Energy West, filed an application with the Public Service Commission of the Department of Public Service Regulation of the State of Montana (the "Montana Commission") to refinance certain debt issues and request the waiver of certain ring-fencing requirements.   The Consumer Counsel of Montana noted that "the Company has seemingly tried to frustrate attempts to reasonably evaluate the motivations driving its new restructuring proposal," and found that the application sought to structure Energy West in a manner that "both complicate[d] and limit[ed] the Commission's ability to implement sound and comprehensive regulatory controls that are sufficient to protect the interests of Montana utility ratepayers."

## IMPROPER STATEMENTS

80.     On September 25, 2012, the Individual Defendants caused the Company to file a Preliminary Proxy Statement with the SEC.   The Preliminary Proxy Statement notified shareholders of the Company's upcoming annual shareholder meeting and, among other things, stated that shareholders would be asked to vote to approve: (i) the proposed acquisition of JDOG's assets; and (ii) the issuance of approximately 256,926 Gas Natural shares to be used as consideration for the acquisition. The Board recommended that shareholders approve both of these proposals.

81.     The Preliminary Proxy Statement purportedly disclosed JDOG's financial results for 2011 and also made certain representations with respect to PUCO and the 2011 Stipulation, stating:

> John D. Marketing had various gas purchase agreements with our Ohio subsidiaries that accounted for 52% of John D. Marketing's revenues in 2011.

> Pursuant to the stipulation issued by the PUCO in October 2011, these agreements were terminated and are subject to an annual competitive bid process in which John D. Marketing will participate. We cannot guarantee that John D. Marketing will be the successful bidder for these new gas purchase agreements. If John D. Marketing is not the successful bidder, its revenues and value to us will be negatively impacted.

In advance of the 2012 annual shareholder meeting held on December 13, 2012, the Company subsequently filed additional proxy statements with the SEC urging shareholder ratification of the JDOG acquisition and issuance of Gas Natural shares.  These proxies were filed on October 29, 2012, November 13, 2012, November 14, 2012, and December 3, 2012.

82.     The Individual Defendants failed to provide material information to allow the shareholders to make a fully informed decision in voting their shares.  In particular, the above noted proxies failed to disclose: (i) that Gas Natural overpaid for natural gas from JDOG, in direct violation of the 2011 Stipulation; (ii) how much of JDOG's revenue and income was directly attributable to the improper fees and premiums that Gas Natural paid to JDOG; and (iii) that Gas Natural rigged the RFP to ensure that JDOG would win the new contracts. Given the 2011 Stipulation and PUCO's recommendations concerning JDOG and the revenues derived from the transactions JDOG engaged in, this information was vital, material information to shareholders voting on the acquisition, including with respect to the true value of the acquisition and the Individual Defendants' true motives for acquiring JDOG.

83.     In spite of the above, the proposals related to the acquisition of JDOG were not approved at the shareholder meeting because the Company failed to obtain a sufficient number of votes.  On December 28, 2012 and January 7, 2013, the Company issued more proxies soliciting votes from abstaining shareholders, urging shareholders to vote for the JDOG acquisition, and noting that the JDOG related vote proposals would remain open until January 18, 2013.  These proxies again failed to disclose the above-noted material information concerning JDOG.

84.     The purported January 18, 2013 deadline came and went without the Company receiving enough votes to approve the JDOG acquisition proposals.  Over the next two months, the Company issued at least three more proxies urging shareholders to vote for the acquisition and extending the date to close voting.  On March 1, 2013, the Individual Defendants finally secured enough votes in favor of the Company acquiring JDOG.

85.     The Company also included false and misleading information with respect to its internal controls in advance of the Company's June 26, 2013 annual shareholders meeting.  On May 10, 2013, the Company filed a Definitive Proxy Statement misrepresenting that Gas Natural's financial statements were presented fairly.  The May 10, 2013 proxy stated, in relevant part:

> In reliance upon (1) the audit committee's reviews and discussions with management and ParenteBeard, (2) management's assessment of the effectiveness of our internal control over financial reporting, and (3) the receipt of an opinion from ParenteBeard, dated April 1, 2013, stating that the Gas Natural financial statements for the year ended December 31, 2012 are presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles, the audit committee recommended to our board that these audited financial statements be included in our Form 10-K for the year ended December 31, 2012, for filing with the SEC.

86.     Gas Natural's quarterly reports also misrepresented the purported adequacy of the Company's internal controls and procedures.  For example, on May 15, 2013, the Company filed on Form 10-Q with the SEC its quarterly report for the period ended March 31, 2013. The Form 10-Q, which was certified as accurate by defendants Smith and R. Osborne, stated that the company's disclosure controls and internal controls were effective.  The Form 10-Q stated in relevant part:

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

As of March 31, 2013, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act. The evaluation was carried out under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer. Based upon this evaluation, our chief executive officer and chief financial officer each concluded that our disclosure controls and procedures were effective as of March 31, 2013.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### THE TRUTH EMERGES

87.　　The truth behind the Company's false and misleading proxy statements, the Company's inadequate internal controls, and the Individual Defendants' wrongdoing began to emerge when PUCO released the 2013 Order on November 13, 2013.  The 2013 Order was not immediately publicized.  Over the next week, however, as analysts and more savvy investors began to discover and digest the dense report, the Company's share price experienced a steady decline.

88.　　On November 19, 2013, the Company filed on Form 10-Q with the SEC its quarterly report for the period ended September 30, 2013. The Form 10-Q disclosed that the Company's internal controls over financial reporting, disclosure controls, and various procedures were not effective.  With respect to the Company's controls, the Form 10-Q stated, in relevant part:

> As of September 30, 2013, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended. The evaluation was carried out under the supervision of and with the participation of our management, including our principal executive officer and principal financial officer. Based

upon this evaluation, our chief executive officer and chief financial officer each concluded that our disclosure controls and procedures were not effective as of September 30, 2013.

In our assessment of the effectiveness of internal control over financial reporting at September 30, 2013, we have identified a material weakness. In 2011, the PUCO, following a gas cost recovery audit, directed us to modify the gas procurement procedures at our Ohio utilities, NEO and Orwell, and adjust amounts billed to our Ohio customers for the audit period. In its audit in 2012, the PUCO staff argued that we failed to comply with the procedures set forth in the prior GCR audit. This led to the disallowance of gas costs in the PUCO's November 13, 2013 Order as discussed in *Note 15 — Subsequent Events* of our accompanying consolidated financial statements. We accrued the amount of the disallowance in the three months ended June 30, 2013 and it remains on our balance sheet as of September 30, 2013. The failure to comply with the PUCO procedure leads management to conclude that we did not maintain adequate and effective internal control in the area of our gas supply procurement and the gas cost recovery through rates.

We have implemented and continue to implement measures that we believe will remediate the material weakness in our internal control over financial reporting described above. We have accrued the amount of the disallowance in the three months ended June 30, 2013 and are in the process of implementing additional controls and procedures to ensure that we adhere to the PUCO Order for future gas procurement procedures. In addition we performed additional analyses and implemented additional procedures designed to provide reasonable assurance that our consolidated financial statements were prepared in accordance with GAAP. As a result, we believe that the condensed consolidated financial statements included in this Form 10-Q as of and for the three and nine months ended September 30, 2013 fairly present, in all material respects, our financial condition, results of operations and cash flow for the periods presented, in conformity with GAAP. We have implemented other changes at Gas Natural to improve our internal control over financial reporting such as (1) hiring a new corporate controller, a new controller at our Ohio utilities and two new general accountants, (2) attending training sessions given by the PUCO for gas recovery procedures, and (3) effecting other corporate and accounting changes referenced in the PUCO Order. We expect to continue our remediation efforts, which will include design, implementation and testing, throughout the fourth quarter of 2013.

We believe that the remediation measures described above will strengthen our internal control over financial reporting and remediate the material weakness we have identified. We are committed to continuing to improve our internal control processes and will continue to diligently review our financial controls and procedures.

89. From November 13, 2013, the day the 2013 Order was released, to November 22, 2013, Gas Natural's stock fell more than 6.6%, or $0.66 per share, to close at $9.23 compared to the November 13 closing of $9.89, erasing almost $7 million in market capitalization.

90. On Friday, November 22, 2013, *Seeking Alpha* broke the news of the Order to the market in a story titled "Gas Natural: Investigation And Insider-Selling Suggests Trouble Ahead."  The article disclosed the PUCO findings and included a link to the 2013 Order.  The following trading day, Gas Natural's stock plummeted another 9.6%, or $0.89 per share, to close at $8.34 compared to the previous trading day's closing of $9.23, erasing another $9.3 million in market capitalization.

91. From the date the 2013 Order was released to the day after the *Seeking Alpha* article broke the news, the Company's market capitalization was devastated by a $16.2 million, or over 15.6% drop.

## REASONS THE STATEMENTS WERE IMPROPER

92. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a) the Company ignored the stipulations set forth in the 2011 Stipulation and continued paying improper fees and premiums to JDOG;

(b) the JDOG acquisition was designed to provide a windfall to defendant R. Osborne rather than to benefit Gas Natural; and

(c) as a result of the foregoing, the representations contained in Gas Natural's proxy statements were improper.

**INSIDER SALES BY DEFENDANTS R. OSBORNE, SMITH, AND DEGENSTEIN**

93.     Rather than providing the market with correct information, the Insider Selling Defendants, R. Osborne, Smith, and Degenstein, used their knowledge of Gas Natural's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.  In particular, after the 2012 Audit, as officers and directors of Gas Natural, the Insider Selling Defendants were privy to material, non-public information about the Company's true business health.  Before the public learned of the disastrous results of the 2012 Audit, the Insider Selling Defendants dumped massive amounts of their stock.

94.     While in possession of this knowledge, between January 1, 2013, and November 13, 2013 (the "Sales Period"), defendant R. Osborne sold over 1 million shares of his personally held Gas Natural stock for proceeds of over $10 million.  Defendant R. Osborne's sales were timed to maximize profit from Gas Natural's then artificially inflated stock price.  Defendant R. Osborne's sales are suspicious given that his stock sales represented over 71% of his holdings as demonstrated by the chart below.  In contrast, during the same amount of time immediately prior to the Sales Period, defendant R. Osborne sold only 40% of his stock.

| | |
|---|---|
| Shares Sold During Sales Period ("SP") | 1,006,911 |
| Shares Remaining After Sales | 405,777 |
| Total Shares Before Sales | 1,412,688 |
| **Total Proceeds from Sales** | **$10,069,110.00** |
| **% of Total Ownership Sold During SP** | **71.28%** |

95.     While in possession of this knowledge, defendant Smith sold over 57,000 shares of his personally held Gas Natural stock for proceeds of over $576,000 during the Sales Period.  Defendant Smith's sales were timed to maximize profit from Gas Natural's then artificially inflated stock price.  Defendant Smith's sales are suspicious given that his stock sales represented almost 95% of his holdings as demonstrated by the chart below.  In contrast, during the same amount of time immediately prior to the Sales Period, defendant Smith did not sell any stock.

| | |
|---|---|
| Shares Sold During SP | 57,244 |
| Shares Remaining After Sales | 3,213 |
| Total Shares Before Sales | 60,457 |
| **Total Proceeds from Sales** | **$576,488.21** |
| **% of Total Ownership Sold During SP** | **94.69%** |

96.      While in possession of this knowledge, defendant Degenstein sold 20,000 shares of his personally held Gas Natural stock for proceeds of over $194,000 during the Sales Period. Defendant Degenstein's sales were timed to maximize profit from Gas Natural's then artificially inflated stock price.  Defendant Degenstein's sales are suspicious given that his stock sales represented almost 95% of his holdings as demonstrated by the chart below.  In contrast, during the same amount of time immediately prior to the Sales Period, defendant Degenstein did not sell any stock.

| | |
|---|---|
| Shares Sold During SP | 20,000 |
| Shares Remaining After Sales | 1,064 |
| Total Shares Before Sales | 21,064 |
| **Total Proceeds from Sales** | **$194,755.70** |
| **% of Total Ownership Sold During SP** | **94.95%** |

97.      In sum, the Insider Selling Defendants sold over $10.84 million worth of stock at artificially inflated prices as detailed by the chart below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **DEGENSTEIN** | 1/22/2013 | 412 | $9.85 | $4,058.20 |
| | 1/22/2013 | 800 | $9.83 | $7,864.00 |
| | 1/22/2013 | 200 | $9.81 | $1,962.00 |
| | 1/22/2013 | 4,354 | $9.80 | $42,669.20 |
| | 1/23/2013 | 1,325 | $9.80 | $12,985.00 |
| | 1/25/2013 | 12,909 | $9.70 | $125,217.30 |
| | | **20,000** | | **$194,755.70** |
| | | | | |
| **R. OSBORNE** | 11/5/2013 | 1,006,911 | $10.00 | $10,069,110.00 |
| | | **1,006,911** | | **$10,069,110.00** |
| | | | | |
| **SMITH** | 5/31/2013 | 1,000 | $10.36 | $10,360.00 |
| | 5/31/2013 | 1,000 | $10.30 | $10,300.00 |
| | 5/30/2013 | 1,000 | $10.30 | $10,300.00 |
| | 5/30/2013 | 1,000 | $10.36 | $10,360.00 |
| | 5/30/2013 | 403 | $10.32 | $4,158.96 |

| | | | | |
|---|---|---|---|---|
| | 5/30/2013 | 597 | $10.25 | $6,119.25 |
| | 5/29/2013 | 5,000 | $10.49 | $52,450.00 |
| | 11/5/2013 | 47,244 | $10.00 | $472,440.00 |
| | | **57,244** | | **$576,488.21** |
| | | | | |
| **Total:** | | **1,084,155** | | **$10,840,353.91** |

## DAMAGES TO GAS NATURAL

98.      As a result of the Individual Defendants' improprieties, Gas Natural artificially inflated prices charged to its consumers for natural gas and disseminated improper, public statements concerning the Company's acquisition of JDOG.   These improper charges and improper statements have devastated Gas Natural's credibility as reflected by the Company's almost $16.2 million, or over 15.6% market capitalization loss.

99.      Gas Natural's reoccurring underhanded business practices also damaged its reputation within the business community and capital markets.  Gas Natural's current and potential customers and business partners consider a company's ability to prevent self-dealing and enter into contracts at arm's-length.  Businesses are less likely to award contracts to companies that place their officers', directors', and affiliates' interests above the interests of the company.  Similarly, businesses are less likely to enter into contracts with companies that show favorability to their affiliates, or companies that are unable to maintain adequate internal controls.   Gas Natural's ability to procure valuable contracts and raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

100.    Further, as a direct and proximate result of the Individual Defendants' actions, Gas Natural has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)    costs incurred from completing a new RFP process for the JDOG supply agreement;

(b)    costs incurred from refunds to customers for artificially high gas prices resulting from the JDOG supply contract;

(c)    costs incurred from refunds to customers for improper premiums paid to JDOG;

(d)    costs incurred from refunding customers for the processing fees paid to Cobra for gas that was never processed;

(e)    costs incurred from responding to previous and future investigations of the Company's improper business practices; and

(f)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Gas Natural.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.    Plaintiff brings this action derivatively in the right and for the benefit of Gas Natural to redress injuries suffered, and to be suffered, by Gas Natural as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.   Gas Natural is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.     Plaintiff will adequately and fairly represent the interests of Gas Natural in enforcing and prosecuting its rights.

103.     Plaintiff was a shareholder of Gas Natural at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Gas Natural shareholder.

104.     The current Board of Gas Natural consists of the following eight individuals: defendants R. Osborne, G. Osborne, Smith, Argo, Victor, Brooksby, Male, and Greaves. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Have the Burden of Proving the Entire Fairness of the Transaction Entered into Between Defendant R. Osborne and the Company**

105.     The directors' fiduciary duties requires the exercise of utmost good faith, fair dealing, disclosure, and avoiding even the impropriety of self-interest or self-dealing.  As discussed in more detail herein, defendant R. Osborne (and his son defendant G. Osborne) stands on both sides of the transactions at issue in this action, including the transactions between the Company and (i) JDOG; (ii) Cobra; (iii) defendant R. Osborne's private companies.  As stated by PUCO's Staff, defendant R. Osborne "exerts the authority and control" over Gas Natural's subsidiaries and the extent of his involvement is "pervasive."  As discussed herein, these arrangements only serve to enrich defendant R. Osborne and provide no apparent legitimate business purpose to Gas Natural.

106.     When a fiduciary stands on both sides of a transaction, as is the case here, the transaction must be entirely fair to the Company's shareholders.  As such, these transactions were required to be reviewed and approved by independent members of the Board.  Further, these independent members of the Board must have adequately informed themselves of the details of

these transactions.  As explained below, however, at least half the Board is not independent of defendant R. Osborne.  Accordingly, the transactions between the Company and defendant R. Osborne controlled companies are subject to the rigorous judicial scrutiny of the entire fairness standard.  Because entire fairness is the standard of review, the challenged self-dealing is not protected by the business judgment rule.  Thus, this Court must presume that the Board did not act on an informed basis, in good faith, and in the honest belief that the challenged transactions were in the best interests of the Company.  The burden of proving the inherent or entire fairness of the related party transactions between the Company and defendant R. Osborne controlled companies, including all aspects of these transactions' negotiation, structure, and terms, is placed upon the Board, as a matter of law.  Accordingly, demand is excused.

**Demand Is Excused Because a Majority of the Board Lacks Independence from, and Is Beholden to, Defendant R. Osborne**

107.    A majority of the Board is not independent from defendant R. Osborne, the primary beneficiary of the transactions and illegal scheme described herein.

108.    To start, defendant G. Osborne is the son of defendant R. Osborne.  Defendant G. Osborne would not vote to initiate litigation against his own father.  Further, defendant R. Osborne is responsible for defendant G. Osborne's lucrative positions at the Company, the President and COO of Energy West Resources, Inc.  Defendant G. Osborne would not vote to initiate litigation against defendant R. Osborne, who as Chairman of the Board and CEO of the Company, controls defendant G. Osborne's employment and therefore livelihood.

109.    Similarly, defendant Smith is the Company's CFO.  Prior to that, he was COO and director of JDOG.  He is also the President of Northeast and Orwell, subsidiaries of the Company and controlled by R. Osborne.  As such, defendant Smith's professional career is the result of him staying in the good graces of defendant R. Osborne.  Moreover, his future employment is

controlled by defendant R. Osborne, as a result of defendant R. Osborne serving as CEO and Chairman of the Company.  Accordingly, defendant Smith will not vote to initiate litigation against defendant R. Osborne.

110.    Defendant Victor is President of Lake Erie College.   In 2009, defendant R. Osborne gave $1.5 million to Lake Erie College.  In response, Lake Erie College named one of the college's centers the "Tommy Osborne Center," after defendant R. Osborne's late son. Defendant R. Osborne's gift was one of the largest donations ever given to the college.   In addition, in 2008, the family of Jerome T. Osborne gave Lake Erie College a $1 million gift. Jerome T. Osborne is defendant R. Osborne's father.  Lake Erie College calls its athletic center the Jerome T. Osborne Family Athletic and Wellness Center, named after defendant R. Osborne's brother.  Due to the close ties between the Osborne family and Lake Erie College, including that the Osborne family is one of the largest donors that the college has ever had, defendant Victor will not vote to initiate litigation against defendant R. Osborne and thereby jeopardize any future gifts to the college.  Further, defendant Victor feels a sense of "owingness" to defendant R. Osborne for the Osborne family's gifts to Lake Erie College, further preventing him from independently considering whether to vote in favor of initiating litigation against defendant R. Osborne.

111.    Defendant Victor's daughter is married to Colin Russ.  Mr. Russ is currently the Company's Chief Information Officer.  Mr. Russ received his undergraduate degree in 2012 from DePaul University.   In August 2013, he married defendant Victor's daughter.   In September 2013, he became the Chief Information Officer for the Company.  The only way Mr. Russ, with his limited experience, could become the Chief Information Officer for a $100 million company is if defendant Victor asked defendant R. Osborne to put Mr. Russ in that position.  Accordingly,

defendant Victor feels a sense of "owingness" to defendant R. Osborne for placing Mr. Russ in a senior level position at the Company. Further, defendant R. Osborne, as CEO of the Company and Chairman of the Board, controls Mr. Russ's employment at the Company. Accordingly, defendant R. Osborne is in control of a significant portion of defendant Victor's daughter's livelihood through her husband, Mr. Russ. Therefore, defendant Victor will not vote to initiate litigation against defendant R. Osborne out of fear of jeopardizing his son-in-law's career and his daughter's livelihood.

112. The extent of defendant R. Osborne's domination and control of the Board is further evinced by the numerous related party transactions that the Board has approved in favor of defendant R. Osborne and his companies. In addition to the self-serving transactions detailed herein, other examples of Board-approved related party transactions include:

(a) In 2010, Gas Natural purchased Lightning and Great Plains for $37.9 million, which consisted of approximately $20.8 million in debt of the acquired companies with the remainder of the purchase price paid in unregistered shares of Gas Natural common stock. Lightning and Great Plains are the parent companies of Orwell, Northeast, Brainard, and Great Plains Land Development Co., Ltd. The Osborne Trust is the majority shareholder for Orwell and Great Plains.

(b) In December 2011, Gas Natural paid $600,000 to purchase 9.24 acres of land from Black Bear Realty Ltd., a company owned and controlled by defendant R. Osborne.

(c) In March 2013, Gas Natural purchased a building in Mentor, Ohio, from entities owned by defendant R. Osborne for $1.5 million.

(d) Energy West has an ongoing office space lease agreement with OsAir Inc., an entity owned by the Osborne Trust and for which defendant R. Osborne is president and CEO.

Energy West is a Gas Natural subsidiary and its board is comprised of Director Defendants R. Osborne, G. Osborne, Smith, Argo, Victor, Brooksby, Male, and Fedeli.

(e)     Gas Natural made a $2.1 million investment in Kykuit Resources, LLC. Defendant R. Osborne owns a 26.4% membership interest in Kykuit Resources, LLC and JDOG is a management member holding a 23.2% membership interest.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

113.    The misconduct at the heart of this case constitutes a threat to the Company's very survival.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities described herein.  Causing the Company to engage in the improper tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants R. Osborne, G. Osborne, Smith, Argo, Victor, Brooksby, Male, and Greaves Face a Substantial Likelihood of Liability for Their Misconduct**

114.    As alleged above, defendant R. Osborne breached his fiduciary duties of loyalty by engaging in a series of transactions to benefit himself at the Company's expenses and by making improper statements in the Company's press releases and SEC filings.

115.    Defendants R. Osborne, G. Osborne, Smith, Argo, Victor, Brooksby, Male, and Greaves all face a substantial likelihood of liability for violating federal securities laws by at least negligently approving the false and misleading proxy statements, as described herein.

116.    Defendants Brooksby, Male, and Victor, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's

Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly, recklessly, or negligently allowing the improper proxies related to the Company's acquisition of JDOG.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Further, the Audit Committee Defendants were responsible for ensuring the Company's compliance with the Code, which among other things, requires that: (i) Company funds must not be used for personal benefit; (ii) business transactions are properly authorized and completely and accurately recorded on the Company's books and records; and (iii) the Company conducts its business in accordance with all applicable laws, rules, and regulations.  In blatant disregard of their duties, the Audit Committee Defendants caused or allowed: (i) defendant R. Osborne to engage in numerous self-serving deals to the detriment of Gas Natural and its shareholders; and (ii) the Company to continuously pay improper fees and premiums to affiliates in violation of various state regulations.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

117.    Defendant R. Osborne sold Gas Natural stock under highly suspicious circumstances.  Defendant R. Osborne, as the Company's CEO and Chairman of the Board, Chairman of Northeast and Orwell, and Chairman and CEO of JDOG, possessed material, non-public Company information and used that information to benefit himself.  Defendant R. Osborne sold stock based on this knowledge of material, non-public Company information regarding the Company's overpayments for natural gas and the impending decrease in the value

of his holdings of Gas Natural as a result of the 2012 Audit.  Accordingly, defendant R. Osborne faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty.  Any demand upon defendant R. Osborne is futile.

118.    Defendant Smith also sold Gas Natural stock under highly suspicious circumstances.  Defendant Smith, as Gas Natural's Vice President, CFO, and director, President of Northeast and Orwell, and a director of JDOG, possessed material, non-public Company information and used that information to benefit himself.  Defendant Smith sold stock based on this knowledge of material, non-public Company information regarding the Company's overpayments for natural gas and the impending decrease in the value of his holdings of Gas Natural as a result of the 2012 Audit.  Accordingly, defendant Smith faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty.  Any demand upon defendant Smith is futile.

119.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Gas Natural for any of the wrongdoing alleged by plaintiff herein.

120.    Plaintiff has not made any demand on the other shareholders of Gas Natural to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Gas Natural is a publicly held company with over 10.4 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    The Director Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading statements to Gas Natural shareholders that were contained in multiple proxy statements.  The proxies contained proposals to Gas Natural's asking for shareholder approval of the JDOG acquisition, as well as approval to list additional shares to be issued as considered for the acquisition.

123.    The proxies, however, misrepresented and failed to disclose material information, including that JDOG and the Company were engaged in a year-long price rigging scheme and that the Company lacked adequate internal controls.

124.    The Director Defendants were at least negligent in filing the proxies with these materially false and misleading statements.

125.    The omissions and false and misleading statements in the proxies are material in that a reasonable shareholder would consider them important in deciding how to vote on the acquisition of JDOG.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the proxies and in other information reasonably available to shareholders.

126.    By reason of the foregoing, the Director Defendants have violated section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

127.   The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the proxies as described herein.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

128.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.   The Individual Defendants owed and owe Gas Natural fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Gas Natural the highest obligation of good faith, fair dealing, loyalty, and due care.

130.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Gas Natural, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

131.   The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) Gas Natural repeatedly overcharged for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) the Company rigged the RFP to ensure its affiliates would win the contracts; and (iii) the Company had severely inadequate internal controls to prevent the above wrongs.  These defendants were also at least negligent in causing or allowing the Company to make misrepresentations in various proxies concerning the Company's acquisition of JDOG.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

132.    Director Defendants, as directors of the Company, owed Gas Natural the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) Gas Natural repeatedly overcharged for natural gas through underhanded contracts with its affiliates in violation of various regulations; (ii) the Company rigged the RFP to ensure its affiliates would win the contracts; and (iii) the Company had severely inadequate internal controls to prevent the above wrongs.  These defendants were also at least negligent in causing or allowing the Company to make misrepresentations in various proxy statements concerning the Company's acquisition of JDOG.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

133.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the false proxy statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants further caused or allowed: (i) defendant R. Osborne to engage in numerous self-serving deals to the detriment of Gas Natural and its shareholders; and (ii) the Company to continuously pay improper fees and premiums to affiliates in violation of various state regulations.  The Audit Committee Defendants completely and utterly failed in their duty of oversight.

134.    Defendants R. Osborne, Smith, and Degenstein breached their duty of loyalty by selling Gas Natural stock on their basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which defendants R.

Osborne, Smith, and Degenstein used for their own benefit when they sold Gas Natural common stock.

135.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Gas Natural has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

136.    Plaintiff, on behalf of Gas Natural, has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Waste of Corporation Assets**

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    As a result of the wrongdoing described herein and by failing to conduct proper supervision, the Individual Defendants have caused Gas Natural to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

139.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of Gas Natural, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Unjust Enrichment**

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Gas Natural.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Gas Natural.

143.    Defendants R. Osborne, Smith, and Degenstein sold Gas Natural stock while in possession of material, adverse non-public information that artificially inflated the price of Gas Natural stock.  As a result, defendants R. Osborne, Smith, and Degenstein profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

144.    Defendant R. Osborne further improperly profited from causing or allowing the Company to purchase JDOG from him.

145.    Plaintiff, as a shareholder and representative of Gas Natural, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

146.    Plaintiff, on behalf of Gas Natural, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Gas Natural, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Gas Natural to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Gas Natural and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the

Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

       1.     a proposal to strengthen the Company's controls over its gas purchasing;

       2.     a proposal to ensure the Company implements a fair, competitive, arms'-length RFP for natural gas purchasing contracts;

       3.     a proposal to ensure appropriate controls are in place to prevent self-dealing by Gas Natural's directors, executives, and other employees;

       4.     a provision to control insider selling;

       5.     a proposal to ensure the adequacy of the qualifications of Gas Natural's directors, executives, and other employees;

       6.     a proposal to appropriately test and then strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       7.     a proposal to appropriately test and then strengthen Gas Natural's oversight of its disclosure procedures; and

       8.     a provision to permit the shareholders of Gas Natural to nominate at least three candidates for election to the Board;

     C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Gas Natural has an effective remedy;

D.     Awarding to Gas Natural restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December 23, 2013                LANDSKRONER GRIECO MERRIMAN, LLC


                                        s/Jack Landskroner
                                        JACK LANDSKRONER (0059227)
                                        DREW LEGANDO (0084209)
                                        1360 West 9th Street, Suite 200
                                        Cleveland, OH 44113
                                        Telephone: (216) 522-9000
                                        Facsimile: (216) 522-9007
                                        jack@lgmlegal.com
                                        drew@lgmlegal.com

                                        RYAN & MANISKAS, LLP
                                        Richard A. Maniskas
                                        995 Old Eagle School Road, Suite 311
                                        Wayne, PA 19087
                                        Telephone: (484) 588-5516
                                        Facsimile:  (484) 450-2582
                                        rmaniskas@rmclasslaw.com

                                        Attorneys for Plaintiff

921033

## **VERIFICATION**

I, Joseph Ferrigno, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: _12 - 20 - 13_

_Joseph F. Ferrigno_
Joseph Ferrigno